UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> U.S. Attorney's Office <br> 601 D Street, NW <br> Washington, DC 20001, <br><br>     Plaintiff, <br><br>     v. <br><br> BOEING 747-300 AIRCRAFT, BEARING <br> TAIL NUMBER YV-3531 AND <br> MANUFACTURER SERIAL NUMBER <br> 23413 <br><br>     Defendant. | Civil A. No. 1:22-cv-3208 |

## UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America (the "United States"), by and through undersigned counsel, brings this verified complaint for forfeiture in a civil action *in rem* against the defendant property, namely: a Boeing 747-300 Aircraft, bearing tail number YV-3531 and manufacturer serial number 23413 ("Aircraft"), and alleges as follows:

## NATURE OF ACTION AND THE DEFENDANT IN REM

1.    This *in rem* forfeiture action arises from an investigation by the Department of Commerce, Bureau of Industry and Security ("BIS") and the Federal Bureau of Investigation ("FBI") into the unlawful transfer of custody and control of the Defendant Aircraft, a U.S. commodity subject to export controls, from a sanctioned Iranian entity to a third party without U.S. Government authorization.

2.    On March 17, 2008, the U.S. Department of Commerce issued a Temporary Denial Order ("TDO") against Mahan Air a/k/a Mahan Airlines a/k/a Mahan Airways ("Mahan Air") in

connection with Mahan Air's reexport and attempted reexport of six U.S.-origin aircraft to Iran without U.S. Government authorization. The TDO, which has been in force since that date through successive renewal, broadly prohibits Mahan Air and other persons or companies acting for or on Mahan Air's behalf, directly or indirectly, from participating in any export or reexport transaction involving U.S.-origin goods. *See* 87 Fed. Reg. 30,173 (May 18, 2022).  Following issuance and renewal of the TDO, in or about October 2021, Mahan Air transferred custody and control of the Defendant Aircraft to Venezuelan airline, Empresa de Transporte Aéreocargo del Sur, S.A. ("EMTRASUR"), a subsidiary of Venezuelan state-owned company, Consorcio Venezolano de Industrias Aeronáuticas y Servicios Aéreos, S.A ("CONVIASA"), without U.S. Government authorization. Between in or about February 2022 and in or about May 2022, EMTRASUR continued to reexport the Defendant Aircraft, including to Tehran, Iran and Moscow, Russia, without U.S. Government authorization. This action seeks the forfeiture of the Defendant Aircraft involved in and used in furtherance of violations of U.S. export control laws.

3.     The Defendant Aircraft is subject to forfeiture pursuant to 50 U.S.C. § 4820(j) as property seized that violated a TDO issued by the Department of Commerce pertaining to the export and reexport of U.S.-origin commodities.  As set forth above and described more fully below, the violations include the transfer of the Defendant Aircraft to EMTRASUR and the reexport of the Defendant Aircraft to destinations such as Iran and Russia, among others, without U.S. Government authorization.  50 U.S.C. § 4820(a)(5).  Such forfeiture "shall be carried out in accordance with [18 U.S.C. § 981]." 50 U.S.C. § 4820(j)(2).

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

5.      This Court has *in rem* jurisdiction over the Defendant Aircraft and venue pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of Columbia.  Specifically, neither Mahan Air, EMTRASUR, CONVIASA, nor their co-conspirators sought or obtained a license from the Department of the Commerce, which is located in Washington, D.C., to transfer custody and control of the Defendant Aircraft and to reexport the Defendant Aircraft, including to Iran and Russia.

### FACTS GIVING RISE TO FORFEITURE

### A.  BACKGROUND

Export Control Reform Act

6.      The Export Control Reform Act ("ECRA"), 50 U.S.C. § 4801 *et seq*., grants the President of the United States the authority, among other things, to "control . . . the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons . . . relating to" specific categories of items and activities.  50 U.S.C. § 4812(a).  ECRA further grants the Department of Commerce the authority to establish the applicable regulatory framework.  50 U.S.C. §§ 4813-4815.

Export Administration Regulations

7.      The Department of Commerce controls the export of certain items, including commodities, software, and technology, from the United States to foreign countries through the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774.  The EAR restricts the export of items for national security, foreign policy and other interests of the United States as reflected in international obligations and arrangements.  15 C.F.R. § 730.6.  It also restricts exports of items that could make significant contributions to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States.  15 C.F.R. § 742.4.  The EAR imposes licensing and other requirements for items subject to the

EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another.  *See* 15 C.F.R. § 730.7.

<u>Commerce Control List and Export Control Classification Numbers</u>

8.      Sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"). 15 C.F.R. part 774.  Items on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which has export control requirements depending upon destination, end use, and end user.  Aircraft and aircraft parts and components are specified items under ECCN 9A991 and are controlled for anti-terrorism purposes as set forth more fully below. 15 C.F.R. part 774.

<u>Iran-Related Export Controls Under the EAR</u>

9.      Pursuant to Section 746.7 of the EAR, the Department of Commerce "maintains licensing requirements on exports and reexports to Iran under the EAR as described in paragraph (a)(1) of this section or elsewhere in the EAR (*See, e.g.,* § 742.8 – Antiterrorism: Iran)." 15 C.F.R. § 746.7 (emphasis added).

10.      Section 742.8 of the EAR provides that "[a] license is required for anti-terrorism purposes to export or reexport to Iran an item for which AT column 1 or AT column 2 is indicated in the Country Cart column of the applicable ECCN . . . ."  *See also* 15 C.F.R. § 746.7(a)(1).

11.      ECCN 9A991 "Aircraft" indicates that "AT applies to [the] entire entry" and that anti-terrorism controls apply under AT Column 1 of the Country Chart.  *See* 15 C.F.R. part 774, Supp. No. 1.  Section 764.7(c) further provides that "[n]o license exceptions[1] may be used for exports or reexports to Iran."  Thus, exports and reexports to Iran of aircraft classified under ECCN

---

[1]      A "License Exception" is "an authorization" in the EAR that allows the "export or reexport under stated conditions [of] items subject to the Export Administration Regulations (EAR) that would otherwise require a license[.]" 15 C.F.R. § 740.1(a).

4

9A991 and controlled for anti-terrorism (AT) reasons require a license, and no license exceptions are available.

Temporary Denial Order

12.     The Department of Commerce may issue a TDO, temporarily denying export privileges, if the Department of Commerce determines such an order is "necessary in the public interest to prevent an imminent violation of the EAA,[2] the EAR, or any order, license or authorization issued thereunder." 15 C.F.R. § 766.24(b).  A TDO is issued for 180 days and can be renewed upon determination that such a renewal is necessary to prevent continued violations. *Id*. at § 766.24(d).

13.     On March 17, 2008, the Department of Commerce issued a TDO imposing export restrictions upon Mahan Air. This TDO has been renewed continuously and remains in effect. 87 Fed. Reg. 30,173 (May 18, 2022).

General Prohibition 10

14.     The EAR also sets forth General Prohibition 10, which prohibits the continued use of an item that was known to have been exported or reexported in violation of the EAR.  15 C.F.R. § 736.2(b)(1) (General Prohibition 10).  The provision provides:

> General Prohibition 10 – Proceeding with transactions with knowledge that a violation has occurred or is about to occur (Knowledge Violation to Occur). You may not sell, transfer, export, reexport, finance, order, buy, remove, conceal, store, use, loan, dispose of, transport, forward, or otherwise service, in whole or in part, any item subject to the EAR and exported or to be exported with knowledge that a violation of the Export

---

[2]     The Export Administration Act of 1979, as amended, or EAA, is the predecessor statute to ECRA.  *See* 50 U.S.C. §§ 4601-4623 (Supp. III 2015).  The EAA lapsed on August 21, 2001 but was kept in force through the President's authority under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq*.  With ECRA's enactment on August 13, 2018, the EAA was partially repealed.  Regulations and order issued under the authority of the EAA and IEEPA continue in effect until modified, superseded, set aside or revoked through action undertaken pursuant to the authority provided under ECRA.  50 U.S.C. § 4826.

Administration Regulations, the Export Administration Act or any order, license, License Exception, or other authorization issued thereunder has occurred, is about to occur, or is intended to occur in connection with the item.  Nor may you rely upon any license or License Exception after notice to you of the suspension or revocation of that license or exception.  There are no License Exceptions to this General Prohibition Ten in part 740 of the EAR.

Notably, no license exceptions are available for General Prohibition 10.

## B.  RELEVANT INDIVIDUALS AND ENTITIES

Government of Iran

15.     On January 19, 1984, the United States designated the Islamic Republic of Iran ("Iran") as a state sponsor of terrorism. 49 Fed. Reg. 2,836 (Jan. 23, 1984) (Secretarial Determination 84-3).  For 2020, the most recent year for which Country Reports on Terrorism are available, the State Department concluded that "Iran continued its terrorist-related activity in 2020, including support for Hizballah, Palestinian terrorist groups in Gaza, and various terrorist and militant groups in Iraq, Syria, and elsewhere throughout the Middle East." *See* https://www.state.gov/reports/country-reports-on-terrorism-2020/iran/.  The State Department further found that "Iran used the Islamic Revolutionary Guard Corps – Qods Force ('IRGC-QF') to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the region," and that "the IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorist activity abroad." *Id.*  To date, the United States has not delisted Iran as a state sponsor of terrorism. *See* https://www.state.gov/state-sponsors-of-terrorism/.

Islamic Revolutionary Guard Corps ("IRGC")

16.     The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system. The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations. According to the Treasury Department's Office of Foreign Assets Control ("OFAC"), the IRGC's activities include the

proliferation of weapons of mass destruction ("WMD") and their means of delivery. *See* https://home.treasury.gov/news/press-releases/sm703.

17.    On October 25, 2007, OFAC designated the IRGC-QF under Executive Order ("E.O") 13224, which is "aimed at freezing the assets of terrorists and their supporters." *See* https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm.  On April 15, 2019, the State Department announced the designation of the IRGC and IRGC-QF as Foreign Terrorist Organizations ("FTOs"). 84 Fed. Reg. 15,278 (Apr. 15, 2019).

Mahan Air

18.    Mahan Air is an Iranian Airline founded in 1992 to provide passenger and freight services domestically and internationally. *See* https://www.mahan.aero/en/about-mahanair. As previously discussed, on March 17, 2008, the Department of Commerce issued a TDO against Mahan Air "to prevent an imminent violation of the [EAR]" involving the transfer and attempted transfer of multiple Boeing 747-300 aircrafts to Iran in violation of the EAR. *See* 84 Fed. Reg. 30,173 (May 18, 2022). The TDO remains in effect. *See id.*

19.    Specifically, the renewed Mahan Air TDO as issued in May 2022[3] prohibits Mahan Air and related named entities from directly or indirectly participating in any way in any transaction involving any item subject to the EAR or any activity subject to the EAR, including but not limited to:

> Carrying on negotiations concerning, or ordering, buying, receiving, using, selling, delivering, storing, disposing of, forwarding, transporting, financing, or otherwise servicing in any way, any transaction involving any item exported or to be exported from the United States that is subject to the EAR, or engaging in any other activity subject to the EAR; or

---

[3] *See* 84 Fed. Reg. 30,174 n. 3 (May 18, 2022) (indicating that prior renewal orders were issued on May 21, 2021 and November 17, 2021 and operative during the relevant time period October 2021 through January 2022).

> Benefitting in any way from any transaction involving any item exported or to be exported from the United States that is subject to the EAR, or from any other activity subject to the EAR.

*Id.* at 30,181.

20. In addition, among other prohibitions, no person may, directly or indirectly, do any of the following:

> Export, reexport, or transfer (in-country) to or on behalf of a Denied Person any item subject to the EAR;
>
> Take any action that facilitates the acquisition or attempted acquisition by a Denied Person of the ownership, possession, or control of any item subject to the EAR that has been or will be exported from the United States, including financing or other support activities related to a transaction whereby a Denied Person acquires or attempts to acquire such ownership, possession or control[.]

*Id. at 30,181.*

21. On or about October 12, 2011, OFAC added Mahan Air to the Specially Designated Nationals and Blocked Persons ("SDN") List pursuant to E.O. 13224 for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)." *See* https://home.treasury.gov/news/press-releases/tg1322; 76 Fed. Reg. 64,427 (Oct. 18, 2011). According to OFAC, Mahan Air provided travel services to IRGC-QF personnel, facilitated IRGC-QF arms shipments, and transported funds used to facilitate the purchase of controlled goods by the IRGC-QF. *See* https://home.treasury.gov/news/press-releases/tg1322. Mahan Air also provided transportation services to Hizballah, a Lebanon-based designated FTO. *Id., see also* https://home.treasury.gov/news/press-releases/sm484.

22. Since its designation, Mahan Air has used various intermediary companies and individuals, "to negotiate sales contracts, and these companies deliberately fail to disclose Mahan

8

Air as the end-user of the purchased equipment." *See* https://home.treasury.gov/news/press-releases/jl0395. These intermediaries use various means to facilitate Mahan Air's operations including by providing false documentation to obtain maintenance services for the Mahan Air fleet, providing parts and services to the Mahan Air fleet, and providing sales, financial, administrative, and marketing services to Mahan Air's freight reception and handling. *See e.g., id.*; https://home.treasury.gov/news/press-releases/sm0395;     https://home.treasury.gov/news/press-releases/sm484; https://home.treasury.gov/news/press-releases/sm853; https://home.treasury.gov/news/press-releases/sm1014.

CONVIASA

23.    On March 30, 2004, then-President of Venezuela Hugo Chavez created Consorcio Venezolano de Industrias Aeronáuticas y Servicios Aéreos, S.A (CONVIASA) through Presidential decree 37,910. http://www.conviasa.aero/en/nosotros/historia. On February 7, 2020, OFAC designated CONVIASA pursuant to E.O. 13884 due to the Maduro regime's misuse of CONVIASA, to include using the airline's aircraft to transport officials of the regime to North Korea, Cuba, and Iran. https://home.treasury.gov/news/press-releases/sm903.

EMTRASUR

24.    On November 19, 2020, through Presidential decree 4,379, Venezuelan President Nicolás Maduro created through Presidential decree 4,379, Empresa de Transporte Aéreocargo del Sur, S.A. (EMTRASUR) as the cargo transport subsidiary of CONVIASA. *See* http://spgoin.imprentanacional.gob.ve/cgi-

win/be_alex.cgi?Documento=T028700034199/0&Nombrebd=spgoin&CodAsocDoc=2335&t04
=1&t05=png&TipoDoc=GCTOF&Sesion=1593376855.[4]

## B.   RELEVANT EVENTS

25.   The Boeing Company, then headquartered in Renton, Washington, manufactured
the Defendant Aircraft, a Boeing 747-300, in the United States in approximately 1986. The
Defendant Aircraft was first placed into service on or about January 23, 1986, by the now-defunct
French company Union de Transports Aériens ("UTA").   The Department of Commerce has
reviewed information related to the Defendant Aircraft and determined that it is subject to the EAR
and classified under ECCN 9A991.

26.   Between in or around 2007 and in or around October 2021, the Defendant Aircraft
was continuously registered, owned and/or operated by Mahan Air under tail number EP-MND.
During that time, since on or about March 17, 2008, and as further described above, Mahan Air
was subject to a TDO issued by the Department of Commerce prohibiting Mahan Air and its agents
or other third parties, directly or indirectly, from participating in any export or reexport transaction
involving U.S.-origin commodities.

27.   In or around July 2021, CONVIASA entered into a Sale and Purchase Agreement
("Agreement"), in which, CONVIASA paid approximately €8,000,000 to Lance Tech General
Trading LLC ("Lance Tech"), a United Arab Emirates-based intermediary, for the Defendant
Aircraft. Under the Agreement, CONVIASA was to receive custody and control of the Defendant
Aircraft in or around October 2021. The Agreement made specific reference to and provided for

---

[4] Electronic copy of the "Gaceta Oficial de la República Bolivariana de Venezuela" or the Official
Gazette of the Bolivarian Republic of Venezuela (Venezuela), an official journal of the state that
gives the public notice of laws and other official acts.

the Islamic Republic of Iran to provide maintenance services through Iran's Maintenance Organization ("MRO") in compliance with the requirements of the Civil Aviation Organization of the Islamic Republic of Iran ("CAO"). *See* Exhibit A: Documento Registrado, Republica Bolivarian de Venezuala Ministerio del Poder Popular para Transporte, p. 21, 23, 27.

28.     In or around October 15, 2021, Mahan Air transferred custody and control of the Defendant Aircraft, through Lance Tech, to EMTRASUR, a subsidiary of CONVIASA. EMTRASUR then registered the Defendant Aircraft under tail number YV-3531. *See id.*

29.     Until on or about January 10, 2022, the Defendant Aircraft was under registration with the Islamic Republic of Iran and operated by Mahan Air. *See* Exhibit B: Certificate of Deregistration, No. 87337.

30.     After acquisition, EMTRASUR subsequently reexported the Defendant Aircraft, including to Iran and Russia, without U.S. Government authorization.[5] For example:

a.     On or about February 19, 2022, the Defendant Aircraft flew from Caracas, Venezuela to Tehran, Iran;

b.     On or about March 13, 2022, the Defendant Aircraft flew from Caracas, Venezuela to Tehran, Iran;

c.     On or about April 17, 2022, the Defendant Aircraft flew from Caracas, Venezuela to Tehran, Iran;

d.     On or about May 21, 2022, the Defendant Aircraft flew from Caracas, Venezuela to Tehran, Iran;

e.     On or about May 24, 2022, the Defendant Aircraft flew from Tehran, Iran to Moscow, Russia; and

---

[5] Determined through materials found onboard the Defendant Aircraft and open-source reporting.

f.      On or about, May 25, 2022, the Defendant Aircraft flew from Moscow, Russia to Tehran, Iran.

31.     On or about June 6, 2022, the Defendant Aircraft landed at Ezeiza International Airport in Buenos Aires, Argentina.

32.     On or about June 13, 2022, the Government of Argentina detained the Defendant Aircraft to conduct a criminal investigation pursuant to its terrorism laws.

33.     Aboard the Defendant Aircraft, Argentinian law enforcement officials found a document titled, "Crew Mini Log, Mahan Air, Flight Operation," indicating the Defendant Aircraft was reexported on other occasions after custody of the Defendant Aircraft was transferred from Mahan Air to EMTRASUR. Specifically:

a.      On or about March 18, 2022, the Defendant Aircraft traveled from Tehran, Iran to Belgrade, Serbia and then to Cape Verde.

b.      On or about March 20, 2022, the Defendant Aircraft left Cape Verde and arrived at in Caracas, Venezuela.

c.      On or about April 4, 2022, the Defendant Aircraft left Caracas, Venezuela and flew to Havana, Cuba and returned to Caracas, Venezuela.

d.      On or about April 7, 2022, the Defendant Aircraft left Caracas, Venezuela and flew to Mexico City, Mexico.

34.     Also onboard the Defendant Aircraft, the investigation revealed numerous references to "Mahan Air" including on the airframe, fire extinguisher, and multiple maintenance service tags with refence to "Mahan Air" with dates between January 2022 and May 2022.

35.     Finally, based upon interviews with Venezuelan staff members, one or more admitted that communication, training, and maintenance related to the Defendant Aircraft occurred through and was coordinated with Mahan Air in Iran.

36.     Neither Mahan Air, Lance Tech, EMTRASUR, CONVIASA, nor their co-conspirators obtained U.S. Government authorization to transfer custody and control of the Defendant Aircraft or to export or reexport the Defendant Aircraft, including to Iran and Russia.

37.     The Defendant Aircraft is currently held on the grounds of Ezeiza International Airport in Buenos Aires, Argentina pursuant to a seizure warrant previously issued by this Court.

## COUNT ONE – FORFEITURE
### (50 U.S.C. § 4820)

38.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 37 above as if fully set forth herein.

39.     Any property seized pursuant to 50 U.S.C. § 4820(a) is subject to forfeiture. 50 U.S.C. § 4820(j).

40.     As described above, at all relevant times, the Defendant Aircraft was in custody and control of Mahan Air, which was subject to export restrictions as set forth in a Temporary Denial Order issued by the Department of Commerce. In direct violation of those restrictions, in or about October 2021, Mahan Air transferred the Defendant Aircraft to EMTRASUR through means of a third party, Lance Tech. Neither Mahan Air, EMTRASUR, CONVIASA, Lance Tech, nor their co-conspirators obtained U.S. Government authorization to transfer custody and control of the Defendant Aircraft or to reexport the Defendant Aircraft, including to Iran and Russia.

41.     The Defendant Aircraft is subject to seizure and forfeiture pursuant to 50 U.S.C. § 4820 and the procedures in 18 U.S.C. § 981. 50 U.S.C. § 4820(j)(2).

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that notice issue on the Defendant Aircraft as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the Defendant Aircraft be forfeited to the United States for disposition according to law; and that the United States be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:          October 18, 2022
                Washington, D.C.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:  _/s/ Rajbir Datta_____
     Rajbir Datta
     N.Y. Bar No. 5206073
     Assistant United States Attorney
     601 D Street, N.W.
     Washington, D.C. 20001
     Phone: (202) 252-7687
     Email: Rajbir.Datta@usdoj.gov

14

## VERIFICATION

I, Adam Mastrianni, a Special Agent with the Federal Bureau of Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 18th day of October 2022.

_Adam Mastrianni_

Special Agent Adam Mastrianni
Federal Bureau of Investigation

I, Robert Cunniff, a Special Agent with the U.S. Department of Commerce, , U.S. Bureau of Industry and Security, Office of Export Enforcement , declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 18th day of October 2022.

_Robert Cunniff_

Special Agent Robert Cunniff
U.S. Department of Commerce
Bureau of Industry and Security
Office of Export Enforcement